[No. B127813. Second Dist., Div. One. Apr. 10, 2000.]

TRUCK INSURANCE EXCHANGE, Plaintiff and Respondent, v. UNIGARD INSURANCE COMPANY, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part B.

**COUNSEL**

Brown & Peterson, David F. Peterson and Marguerite L. Brown for Defendant and Appellant.

O'Flaherty, Cross, Martinez, Ovando & Hatton, O'Flaherty, Cross, Martinez & Ovando, Robert M. Dato, Brian P. Barrow; Hatton, Petrie & Stackler and Arthur R. Petrie II for Plaintiff and Respondent.

## OPINION

**MASTERSON, J.**—Faced with multiple lawsuits, a company tendered the defense of the actions to one of its insurers. After paying defense costs and indemnity, the insurer looked to an alleged coinsurer for contribution. The coinsurer refused to contribute on the ground that it had not been asked to participate in the litigation, by tender of defense or otherwise. This lawsuit followed. The trial court found that the coinsurer was obligated to contribute. We disagree and reverse.

## BACKGROUND

In the late 1980's and early 1990's, The Anden Group, a general contractor, worked on several residential developments in Southern California. Anden contracted with Applied, Inc., or a related company to waterproof the outdoor decks of the homes. After the properties were sold, the homeowners began to notice construction problems, including water damage to the decks. Litigation ensued. From 1989 to 1993, Anden was named as a defendant in five separate actions alleging construction defects. Each time, Anden filed a cross-complaint against the subcontractors and other companies involved in the construction project.[1] The history of the litigation is as follows.

Meadowwood Village, located in Rancho Cucamonga, is a condominium complex consisting of 41 buildings, each housing eight units. On November 2, 1989, the Meadowwood homeowners association filed a construction defect action against Anden (*Meadowwood Village Homeowners Association v. The Anden Group* (Super. Ct. San Bernardino County, 1989, No. RCV051111)). Anden cross-complained against "Applied, Inc. dba Applied Systems Waterproofing" and its officers. The defense of the cross-complaint was tendered to respondent Truck Insurance Exchange. Truck retained Cummings & Kemp to defend Applied, Inc.; it chose separate counsel, Nyman & Johnson, to defend the officers. All told, Truck paid $154,652 in defense costs and approximately $50,000 in indemnity. A tender was also made to appellant Unigard Insurance Company. It paid $25,000 in defense costs and $30,000 in indemnity.[2]

Cimarron Oaks VI is a 35-unit residential development in Ontario. On August 6, 1991, the Cimarron Oaks VI homeowners association filed

---

[1]More than 40 entities and individuals were named as cross-defendants.

[2]Unigard insured one entity, "Applied, Inc." Truck, on the other hand, insured "Applied Systems," "Applied, Inc. dba Applied Systems Waterproofing," "Applied Water Proofing," and three individuals (Allan Kalpakoff, Jodie Randles, and June Hozen) doing business as "Applied Systems Waterproofing."

suit against Anden, alleging various construction defects (*Cimarron Oaks VI v. The Anden Group* (Super. Ct. San Bernardino County, 1991, No. RCV059099)). Anden filed a cross-complaint against Applied Systems and its officers. By letter dated October 2, 1992, the defense of the cross-complaint was tendered to Truck. The defense was never tendered to Unigard.[3] Truck retained Cummings & Kemp to represent Applied Systems and chose Nyman & Johnson to represent the officers.[4] Truck paid $60,720 in defense costs and $15,000 in indemnity.[5]

Another project, Cimarron Oaks XI, located in Diamond Bar, led to a similar lawsuit against Anden (*Cimarron Oaks XI v. The Anden Group* (Super. Ct. L.A. County, 1991, No. KC004708)). As in *Cimarron Oaks VI*, Anden cross-complained against Applied Systems and its officers. The defense was tendered to Truck but not to Unigard. Once again, Truck retained the same counsel to separately represent the company and the officers.[6] Truck paid $84,870 in defense costs and $10,000 in indemnity.[7]

Homeowners in Vista del Flores, a 160-unit complex in Lake Forest, also filed a construction defect action against Anden (*Vista Del Flores v. The Anden Group* (Super. Ct. Orange County, 1993, No. 715927)). This time, Anden cross-complained against Applied, Inc., not Applied Systems or its officers. Applied, Inc., tendered the defense to Truck on August 4, 1994. Truck, in turn, retained Cummings & Kemp as defense counsel. Four months later, on or about December 14, 1994, Unigard received notice of the lawsuit. In response, Unigard began contributing to Applied, Inc.'s defense.

---

[3]On the Cimarron Oaks VI project, Anden entered into a subcontract with "Paul Hozen dba Applied Systems" to waterproof the decks. Unigard's insured, Applied, Inc., was not a party to the subcontract. Nor did Unigard insure the Paul Hozen enterprise.

[4]Although the cross-complaint was against Applied Systems, Cummings & Kemp appeared on behalf of "Applied, Inc., a dissolved California corporation, erroneously sued and served as Applied Systems, and/or Allan Kalpakoff dba Applied Systems Waterproofing, and/or Allan Kalpakoff dba Applied Systems."

[5]Unigard contacted Truck about coverage for *Cimarron Oaks VI* and was told the defense of that action was *not* being tendered to Unigard. This came about as a result of a letter dated April 29, 1993, in which Truck tendered the defense in *Meadowwood Village* to Unigard. The letter stated that the *Meadowwood Village* cross-complaint was attached, but it was not. Instead, the cross-complaint in *Cimarron Oaks VI* was enclosed. By letter dated May 26, 1993, Unigard informed Truck that "[t]here appears to be confusion regarding which case you are actually tendering . . . ." In response, Truck indicated that the *Meadowwood Village* case was being tendered, not *Cimarron Oaks VI*. On appeal, neither side attaches any legal significance to this string of events.

[6]Cummings & Kemp appeared on behalf of "Applied, Inc. a dissolved California corporation, previously dba Applied Systems Waterproofing, sued and served erroneously herein as Applied Systems."

[7]Applied, Inc., Unigard's insured, performed the waterproofing on the Cimarron Oaks XI project. We do not know how or when Unigard learned this.

By the end of the action, Truck had paid $23,693 in defense costs; Unigard had paid $9,309. On June 4, 1996, the case was mediated and settled. Truck and Unigard each paid $12,500 in indemnity.[8]

Finally, in Chino Hills, residents of Sunset Townhomes, a condominium complex, were experiencing similar construction problems. They, too, filed suit against Anden (*Sunset Townhomes Homeowners Association v. The Anden Group* (Super. Ct. San Bernardino County, 1993, No. RCV03140)). They also named Applied, Inc., as a defendant. For its part, Anden filed a cross-complaint against Applied, Inc. In a letter dated July 25, 1994, Applied, Inc., tendered the defense to Truck. Under a reservation of rights, Truck retained Cummings & Kemp as defense counsel. Shortly thereafter, the case was also tendered to Unigard and Golden Eagle Insurance Company, both of which agreed to participate in the defense. On May 11, 1995, Truck withdrew from the case, having paid $12,453 in defense costs.[9] Unigard incurred $12,111 in defense costs. In or around April 1996, the case settled for $75,000, with Unigard and Golden Eagle each paying half.[10]

On April 30, 1997, after all of the construction defect cases had settled, Truck filed this action against seven insurance companies, seeking declaratory relief and equitable contribution. Neither Applied, Inc., nor Truck had requested Unigard's participation in the *Cimarron* cases before they settled. Rather, by letter dated May 27, 1997—one month after the present action was filed but before it was served—Truck demanded contribution and threatened to serve the complaint if Unigard refused to contribute. Truck's letter, consisting of 14 pages, recited the details of the underlying litigation and included several tables depicting the defense and indemnity payments made or allegedly owed by eight insurers, including itself.

By letter of June 24, 1997, Unigard informed Truck that it was not liable for contribution in the *Cimarron* cases because it had not been tendered the defense. Unigard denied liability in the other cases on the ground that it had already paid defense costs and indemnity as to them. Truck decided to go forward with this action.

---

[8] The two insurers also contributed equally to a $5,000 payment made under an "additional insured" endorsement. The parties have not discussed the language or scope of that endorsement. (See generally *National Union Fire Ins. Co. v. Nationwide Ins. Co.* (1999) 69 Cal.App.4th 709, 719-721 [82 Cal.Rptr.2d 16] [discussing "additional insured" endorsement]; *Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321, 324-331 [81 Cal.Rptr.2d 557] [same].)

[9] Truck withdrew upon learning that its insurance policy had expired before Applied, Inc., agreed to work on the Sunset project.

[10] As in *Vista del Flores*, the settlement in *Sunset Townhomes* included a sum based on an "additional insured" endorsement. (See fn. 8, *ante*.)

On June 29 and June 30, 1998, Truck's claims for declaratory relief and contribution were tried to the court on stipulated facts.[11] The trial court found in favor of Truck. More specifically, the court ruled that Unigard was liable for 50 percent of the defense costs and indemnity in *Cimarron Oaks VI*, *Cimarron Oaks XI*, *Vista del Flores*, and *Sunset Townhomes*.[12]

As to the *Cimarron* cases, Unigard was found liable for $103,600 in defense costs, indemnity, and interest. With respect to *Vista del Flores* and *Sunset Townhomes*, the trial court determined that Unigard was liable for a total of $15,330. Prejudgment interest was also awarded. The trial court reduced Unigard's liability to account for the contribution payments made by other insurers. On September 15, 1998, judgment was ultimately entered in Truck's favor for $100,860. Unigard filed a timely appeal.

## DISCUSSION

Unigard contends that it is not liable for defense costs or indemnity with regard to the *Cimarron* cases because it was not tendered the defense or otherwise put on notice of a potential claim for contribution. As to *Vista del Flores* and *Sunset Townhomes*, Unigard argues that the trial court erred in the way it allocated the loss among coinsurers and that prejudgment interest should not have been awarded. We address these points seriatim.[13]

### A. The *Cimarron* Cases

The question of whether Truck is entitled to contribution from Unigard in the *Cimarron* cases rests on the application of equitable principles to stipulated facts. Accordingly, we are presented with a question of law, which we decide de novo. (See *20th Century Ins. Co. v. Stewart* (1998) 63 Cal.App.4th 1333, 1337 [74 Cal.Rptr.2d 492]; *Carroll v. County of Los Angeles* (1997) 60 Cal.App.4th 606, 608 [70 Cal.Rptr.2d 504].)

The trial court concluded that Unigard was liable for contribution on the *Cimarron* cases, stating: "Truck's right to contribution does not depend on its tender of the underlying matters to Unigard." We agree that Truck did not have to tender the defense to Unigard. However, we conclude that, when Truck undertook the defense in the *Cimarron* cases, it should have notified Unigard of the possibility of contribution.

---

[11]At the pleading stage, Unigard had filed a cross-complaint against eight insurance companies, including Truck. By the time of trial, Unigard had dismissed all cross-defendants except Truck.

[12]Apparently, the dispute involving Meadowwood Village was resolved before trial.

[13]We discuss allocation of the loss and the award of prejudgment interest in the unpublished portion of the opinion.

■ "Equitable contribution is . . . the right to recover . . . from a co-obligor who shares such liability with the party seeking contribution. In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others. . . . Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was equally and concurrently owed by the other insurers . . . . The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others. [Citations.]

"[T]he reciprocal contribution rights of coinsurers who insure the same risk are based on the equitable principle that the burden of indemnifying or defending the insured with whom each has independently contracted should be borne by all the insurance carriers together, with the loss equitably distributed among those who share liability for it . . . ." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1293-1294 [77 Cal.Rptr.2d 296], italics and fn. omitted.) ■ The right to contribution " 'do[es] not arise out of contract, for [the coinsurers'] agreements are not with each other . . . . Their respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden. As these principles do not stem from agreement between the insurers[,] their application is not controlled by the language of their contracts with the respective policy holders.' " (*Signal Companies, Inc. v. Harbor Ins Co.* (1980) 27 Cal.3d 359, 369 [165 Cal.Rptr. 799, 612 P.2d 889, 19 A.L.R.4th 75] (*Signal Companies*).)

Even so, absent compelling equitable reasons, courts should not impose an obligation on an insurer that contravenes a provision in its insurance policy. (*Signal Companies, supra,* 27 Cal.3d at p. 369.) Further, our Supreme Court has "expressly decline[d] to formulate a definitive rule applicable in every case in light of varying equitable considerations which may arise, and which affect the insured and the primary and excess carriers . . . ." (*Ibid.*) In determining whether one insurer is entitled to contribution from another, " '[c]ourts should consider the nature of the claim, the relation of the insured to the insurers, the particulars of each policy and any other equitable considerations.' " (*Fire Ins. Exchange v. American States Ins. Co.* (1995) 39 Cal.App.4th 653, 664 [46 Cal.Rptr.2d 135]; accord, *Signal Companies, supra,* 27 Cal.3d at p. 369.)

■ Turning to the particulars of the Unigard policy, we focus on three of its provisions. First, the policy contained a "notice" provision requiring

the insured to "promptly" inform Unigard of any claims, "suits," or "occurrences."[14] The notice provision also required the insured to "immediately" forward a copy of "any demands, notices, summonses or legal papers received in connection with [a] claim or 'suit.'"

Second, the policy contained a "cooperation" clause, which provided that the insured would "[c]ooperate with [Unigard] in the investigation, settlement or defense of the claim or 'suit.'"

Last, the policy prohibited payments by the insured without Unigard's consent, stating: "No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than of first aid, without our consent."

These three provisions play an important role in defining the insured-insurer relationship. With respect to notice provisions, one Court of Appeal has explained: "'[A]n "occurrence" policy provides coverage for any acts or omissions that arise during the policy period even though the claim is made after the policy has expired.' . . . [¶] . . . [¶] Occurrence policies were developed to provide coverage for damage caused by collision, fire, war, and other identifiable events. . . . Because the occurrence of these events was relatively easy to ascertain, the insurer was able to 'conduct a prompt investigation of the incident . . . .' . . . Notice provisions contained in such occurrence policies were 'included to aid the insurer in investigating, settling, and defending claims,' . . ." (*Pacific Employers Ins. Co. v. Superior Court* (1990) 221 Cal.App.3d 1348, 1356-1358 [270 Cal.Rptr. 779], citation omitted.) If an insured breaches a notice provision, resulting in substantial prejudice to the defense, the insurer is relieved of liability. (*Id.* at p. 1357; accord, *Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 881-883 [151 Cal.Rptr. 285, 587 P.2d 1098]; *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 759-761 [15 Cal.Rptr.2d 815].)

Similarly, cooperation clauses serve an important purpose. █ "[A] condition of a policy requiring the cooperation and assistance of the assured in opposing a claim or an action lodged against him by an injured person is material to the risk and of the utmost importance in a practical sense. Without such cooperation and assistance the insurer is severely handicapped and may in some instances be absolutely precluded from advancing any

---

[14]The policy defined "suit" to include "a civil proceeding in which damages because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this insurance applies are alleged." "Occurrence" meant "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

defense." (*Valladao v. Fireman's Fund Indem. Co.* (1939) 13 Cal.2d 322, 328-329 [89 P.2d 643].) "[S]uch provisions 'enable the [insurer] to possess itself of all knowledge, and all information as to other sources and means of knowledge, in regard to facts, material to [its] rights, to enable [it] to decide upon [its] obligations, and to protect [itself] against false claims.' " (*Wood v. Allstate Ins. Co.* (7th Cir. 1994) 21 F.3d 741, 745, quoting *Claflin v. Commonwealth Insurance Co.* (1884) 110 U.S. 81, 94-95 [3 S.Ct. 507, 514-515, 28 L.Ed. 76].) ▇▇▇ Where an insured violates a cooperation clause, the insurer's performance is excused if its ability to provide a defense has been substantially prejudiced. (*Campbell v. Allstate Ins. Co.* (1963) 60 Cal.2d 303, 305-307 [32 Cal.Rptr. 827, 384 P.2d 155]; *Northwestern Title Security Co. v. Flack* (1970) 6 Cal.App.3d 134, 140-142 [85 Cal.Rptr. 693].)

Finally, we come to the provision prohibiting an insured from making voluntary payments without the insurer's consent. Typically, a breach of that provision occurs, if at all, before the insured has tendered the defense to the insurer. ▇▇▇ "The duty to defend is 'a continuing one, arising on *tender of defense* and lasting until the underlying lawsuit is concluded [citation], or until it has been shown that there is no potential for coverage . . . .' " (*Foster-Gardner, Inc. v. National Union Fire Ins Co.* (1998) 18 Cal.4th 857, 869 [77 Cal.Rptr.2d 107, 959 P.2d 265], italics added, original italics omitted.) Phrased somewhat differently, " '[t]he duty to defend arises when the insured *tenders defense* of the third party lawsuit to the insurer.' " (*Id.* at p. 886, italics added.) The "temporal limits of the insurer's duty to defend [fall] between tender of the defense and conclusion of the action." (*Ibid.*, italics omitted.)

The same temporal limits are relevant where an insured has made a voluntary payment in defending an action or resolving a claim. As our Supreme Court has noted: "The provisions . . . requiring [the insurer's] prior consent to the expenditure of defense costs and permitting [the insurer] to assume the defense of any claim are common in [all] liability insurance policies. Their purpose 'is to prevent collusion as well as to invest the insurer with the complete control and direction of the defense or compromise of suits or claims. . . .' " (*Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.G.* (1970) 3 Cal.3d 434, 449 [91 Cal.Rptr. 6, 476 P.2d 406] (*Gribaldo*).)

In *Gribaldo*, the high court also stated that where, upon tender of the defense, an insurer wrongly refuses to defend, the insured may undertake its own defense and recover from the insurer the expenses of litigation, including costs and attorneys' fees. (*Gribaldo, supra,* 3 Cal.3d at p. 449; see also *Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791 [244

Cal.Rptr. 655, 750 P.2d 297] [where insurer erroneously denies coverage or fails to provide a defense, settlement payment made by insured, if reasonable, creates presumptive evidence of insurer's liability]; *Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500, 527-530 [42 Cal.Rptr.2d 295] [if insurer wrongfully denies coverage, and insured settles case based on informed, good faith effort, insurer has burden of proving that settlement was unreasonable or the consequence of fraud or collusion].)

More recently, in *Jamestown Builders, Inc. v. General Star Indemnity Co.* (1999) 77 Cal.App.4th 341 [91 Cal.Rptr.2d 514] (*Jamestown Builders*), a home developer spent more than $1.4 million to repair water intrusion defects in a residential development, all without notifying its insurer. (*Id.* at pp. 345, 351.) In a subsequent bad faith action by the developer, the insurer invoked the provision prohibiting voluntary payments. The trial court dismissed the action on demurrer. The Court of Appeal affirmed, stating: "California law enforces such no-voluntary-payments provisions in the absence of economic necessity, insurer breach, or other extraordinary circumstances. . . . They are designed to ensure that responsible insurers who promptly accept a defense tendered by their insureds thereby gain control over the defense and settlement of the claim." (*Id.* at p. 346, citations omitted.)

The Court of Appeal went on to explain that, unlike a notice provision or a cooperation clause, a no-voluntary-payment provision can be enforced without a showing of prejudice: " '[T]he existence or absence of prejudice to [the insurer] is simply irrelevant to [its] duty to indemnify costs incurred *before* notice. The policy plainly provides that notice is a *condition precedent* to the insured's right to be indemnified; a fortiori the right to be indemnified cannot relate back to payments made or obligations incurred before notice. . . . The prejudice requirement . . . applies only to the insurer's attempt to assert lack of notice as a *policy defense* against payment even of losses and costs incurred *after* belated notice.' " (*Jamestown Builders, supra*, 77 Cal.App.4th at p. 350, quoting *Xebec Development Partners, Ltd. v. National Union Fire Ins. Co.* (1993) 12 Cal.App.4th 501, 566 [15 Cal.Rptr.2d 726], italics in original.) The Ninth Circuit Court of Appeals is in agreement. (See *Faust v. The Travelers* (9th Cir. 1995) 55 F.3d 471, 472-473 [California courts consistently enforce no-voluntary-payment provisions without a showing of prejudice, but insurer must show prejudice with respect to breach of notice provision or cooperation clause].)[15]

 Having discussed the particulars of the Unigard policy, we next examine—in light of those particulars—the relation of Applied, Inc., to

[15]There may be exceptions to the prohibition on voluntary payments, as where the insured is unaware of the identity of the insurer, the payment is necessary for reasons beyond the

Unigard and the nature of Truck's claim against Unigard. (See *Fire Ins. Exchange v. American States Ins. Co.*, *supra*, 39 Cal.App.4th at p. 664; *Signal Companies*, *supra*, 27 Cal.3d at p. 369.) In so doing, we are mindful that the rights and obligations between insurers are controlled by " 'equitable principles designed to accomplish ultimate justice.' " and " 'not . . . by the language of their contracts with the respective policy holders.' " (*Signal Companies*, *supra*, 27 Cal.3d at p. 369.)

Nevertheless, although the policy language may not be controlling, it is certainly relevant. After all, we are supposed to consider the particulars of the policy in deciding whether equitable contribution is appropriate. (*Fire Ins. Exchange v. American States Ins. Co.*, *supra*, 39 Cal.App.4th at p. 664; *Signal Companies*, *supra*, 27 Cal.3d at p. 369.) By way of example, in *Signal Companies*, the Supreme Court held that, as between a primary insurer and an excess insurer, the former is solely responsible for defense costs even though the *claim* against the insured may be for a sum in excess of the primary coverage (27 Cal.3d at p. 368); however, the duty to defend may shift to the excess insurer once the primary limits are exhausted (*id.* at pp. 365-369; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1999) ¶¶ 7:679 to 7:686.1, pp. 7B-49 to 7B-51).

While the court in *Signal Companies* acknowledged the importance of equitable principles, it also pointed out: "[The excess insurer's] policy explicitly states that its liability would not attach until the primary coverage has been exhausted. . . . [It further] provides that the duty to contribute to costs would arise only if [the insured] obtained [the excess insurer's] written consent to incur costs which [the insured] neither sought nor obtained. . . . [¶] . . . [The primary insurer's] fundamental contention would require [the excess insurer] to contribute to the defense costs incurred by the primary carrier even though excess liability might never attach and *despite the explicit provisions of [the excess insurer's] policy*. . . . [¶] . . . [¶] To impose an obligation on [the excess insurer] to reimburse [the primary insurer] *in contravention of the provisions of its policy* could only be justified . . . by some compelling equitable consideration. We find no such consideration here." (*Signal Companies*, *supra*, 27 Cal.3d at p. 367-369, italics added.)

In this case, the question is not *whether* coinsurers can seek contribution from one another. Clearly, they can. Rather, the question is *when* does an insurer that is providing a defense have to raise the issue of contribution

insured's control, or the insured faces a situation requiring an immediate response to protect its legal interests. (*Jamestown Builders*, *supra*, 77 Cal.App.4th at p. 348; accord, *Fiorito v. Superior Court* (1990) 226 Cal.App.3d 433, 438-440 [277 Cal.Rptr. 27].) Truck does not rely on any such exception.

with potential coinsurers that are not participating in the litigation due to a lack of tender.

Obviously, at some point, Truck had to determine the identity of potential coinsurers. According to Truck, regardless of when it acquired that knowledge, notice to potential coinsurers was not necessary until the underlying actions had concluded. We reject that position and find that notice should be given sooner rather than later.

■ The insured-insurer relationship is based on the premise that, in the event of a claim, occurrence, or suit, the insured will tender the defense to the insurer, which will provide a defense and control the litigation with the full cooperation of the insured. "When the insurer provides a defense to its insured, the insured has no right to interfere with the insurer's control of the defense . . . ." (*Safeco Ins. Co. v. Superior Court* (1999) 71 Cal.App.4th 782, 787 [84 Cal.Rptr.2d 43].)

■ Applied, Inc., Unigard's insured, tendered the defense of the *Cimarron* cases to Truck, not Unigard.[16] Absent tender, it is difficult to understand what, if anything, Unigard was supposed to do. (See *Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra*, 18 Cal.4th at pp. 869, 886 [insurer's duty to defend arises upon tender of defense].) Although the defense was tendered to, and accepted by, Truck, Unigard did not receive notice of its potential liability for contribution until *after* the *Cimarron* cases were resolved.

Under these circumstances, the imposition of contribution on Unigard—a stranger to the litigation—would subject it to a significant financial burden even though it did not enjoy any of the concomitant benefits, e.g., the right to participate in and control the defense. Truck decided to investigate and settle the *Cimarron* cases without Unigard's involvement. Having done so, Truck should not be permitted to drag Unigard into the picture after the fact.

Truck's contention that notice of potential contribution can await the end of the underlying litigation is especially troublesome where an alleged coinsurer has provided coverage to one of several related entities that use a similar name. In that situation, it is all the more important to notify the coinsurer early on that a claim of contribution is possible. With prompt

---

[16]Tender can be either formal or constructive. (See *Shell Oil Co. v. National Union Fire Ins. Co.* (1996) 44 Cal.App.4th 1633, 1638, 1640, 1649 [52 Cal.Rptr.2d 580] [formal]; *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 37 [221 Cal.Rptr. 171] [constructive]; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 7:614 to 7:616, pp. 7B-28.3 to 7B-29 [discussing formal and constructive tender].)

notice, the coinsurer can investigate the matter and decide whether to join in the defense. If, however, notice is given *after* the underlying litigation is over, the matter is more likely to end up in court.

For instance, in the late 1980's, there were three separate but related businesses operating under a variation of "Applied": Applied Systems, Applied Systems Waterproofing, and, Unigard's insured, Applied, Inc.[17] The named cross-defendant in the *Cimarron* cases, Applied Systems, was not insured by Unigard. Further, the record does not suggest that Unigard knew or should have known that Applied, Inc., was or would be a cross-defendant in the *Cimarron* cases. On the contrary, from a coverage perspective, *Cimarron Oaks VI* and *Cimarron Oaks XI* were substantially similar, and Truck had already made clear that *Cimarron Oaks VI* was *not* being tendered to Unigard. Quite possibly, Truck had superior knowledge that Applied, Inc., was the proper cross-defendant in the *Cimarron* cases.[18]

If Truck had notified Unigard about potential contribution at the beginning of the *Cimarron* litigation, Unigard would have had two options. It could have decided not to participate in the defense, thereby risking a finding of liability in a separate action. Or it could have joined in the defense, making coverage litigation unnecessary. Indeed, in the other underlying cases—*Meadowwood*, *Vista del Flores*, and *Sunset Townhomes*—a tender was made to Unigard, and it paid defense costs and indemnity in all three. Unfortunately, the approach taken by Truck—notice in the form of a summons and complaint—came too late for Unigard to participate in the *Cimarron* cases. It also spawned a second round of litigation.

Moreover, since Unigard did not consent to any expenditures in the *Cimarron* litigation, the no-voluntary-payment provision precluded Applied, Inc. from recovering against Unigard. Truck does not dispute this. Instead,

---

[17]As alleged in Truck's complaint: (1) Applied Systems was a fictitious business name for Paul and June Hozen, who used the name until they went out of business in early 1986; (2) in May 1986, Allan Kalpakoff began doing business as Applied Systems Waterproofing; (3) in January 1987, Kalpakoff and Jodie Randles formed Applied, Inc.; (4) in February 1987, Kalpakoff and Randles filed a fictitious business statement so that Applied, Inc. could do business as Applied Systems Waterproofing; and (5) in June 1989, Kalpakoff and Randles stopped doing business as Applied Systems Waterproofing and started using Inland Waterproofing and Sheet Metal. Putting the complaint aside, the record does not explain the relationship between the various "Applied" entities.

[18]Although Applied Systems was the *named* cross-defendant, Truck retained defense counsel who appeared on behalf of "Applied, Inc., a dissolved California corporation, erroneously sued and served as Applied Systems . . . ." (See fn. 4, *ante*; see also fn. 6, *ante*.) As far as we can tell, Unigard did not know that Applied, Inc., had been involved in the Cimarron projects.

Truck asserts that *it* can obtain contribution from Unigard because the rights and obligations between coinsurers are governed by principles of equity, not policy provisions. That assertion is true as far as it goes, but we fail to see the equity in Truck's point of view. To say that an insured cannot recover against its insurer is not to say that a coinsurer can.

■ The no-voluntary-payment provision is based on the equitable rule that " 'the insurer [is invested] with the *complete control and direction* of the defense' " (*Gribaldo, supra,* 3 Cal.3d at p. 449, italics added), and is thus not liable for any voluntary payments, expenses, or other obligations assumed by the insured without the insurer's consent. ■ To deny Unigard control (or shared control) of the defense in the *Cimarron* cases and then saddle it with expenses about which it knew nothing strikes us as the antithesis of equity.

"[I]t is only when the insured has *requested and been denied* a defense by the insurer that the insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's prior consent, and under the compulsion of that refusal undertake his own defense at the insurer's expense. . . . [¶] . . . [¶] . . . [If the insureds had] made the statutory demand [for a defense], [the insurers] would have been required to choose between accepting the defense at their expense, consenting to the expenditure of defense costs by [the insureds'] attorney, or refusing to defend (in which case [the insureds] could have assumed the defense at [the insurers'] expense). *Having failed to make such a demand* and thereby put [the insurers] to a choice, [the insureds] should not be entitled to recover defense costs voluntarily incurred by them." (*Gribaldo, supra,* 3 Cal.3d at pp. 449-450, italics added.) Similarly, since Truck failed to put Unigard to a choice about joining in the defense, equity precludes Truck from being reimbursed for expenses it alone approved.

"[Unigard] did not turn down any tender of a defense, nor did it disclaim coverage responsibilities . . . . It took no action to prevent [Applied, Inc.,] from promptly tendering [a] claim, and there is no basis for findings of waiver, detrimental reliance, or insurer misconduct or nonperformance." (*Jamestown Builders, supra,* 77 Cal.App.4th at p. 348.) Because "the ['no voluntary payment'] provision protects against coverage by fait accompli" (*id.* at p. 346), Truck is not entitled to contribution.[19]

In sum, the defense of the *Cimarron* cases was tendered to Truck. Because the cases were not tendered to Unigard, Truck should have notified Unigard

---

[19]Truck contends that Unigard insured not only the Applied entities but also their officers. Assuming that to be true, our analysis of the notice issue remains the same. Neither the entities nor the officers tendered the defense of the *Cimarron* cases to Unigard or gave notice

of the potential for contribution. The notice should have been made promptly after Truck agreed to provide a defense. That is not to say that Truck had to tender the defense to Unigard. A simple notice regarding the possibility of contribution would have been sufficient.[20]

Our conclusion finds support in the case law of other jurisdictions. In *Casualty Indem. Ins. v. Liberty Nat. Fire Ins. Co.* (D.Mont. 1995) 902 F.Supp. 1235, two insurers provided liability coverage for the owners of a motel. A guest at the motel (Miller) suffered injuries and brought suit against the owners. The summons and complaint were forwarded to one insurer (Casualty Indemnity) but not the other (Liberty National), due in part to the fact that the owners had forgotten about the Liberty National policy. Casualty Indemnity retained defense counsel and settled the case by paying the policy limits. After the settlement was completed, the owners of the motel discovered the Liberty National policy and demanded that Liberty National contribute to the settlement. That demand was rejected, and Casualty Indemnity filed suit against Liberty National for contribution. In granting summary judgment for Liberty National, the court, applying Montana law, concluded: "[E]quity dictates that Casualty not be allowed to obtain contribution from Liberty National. First, the demand made by the [insureds] occurred after a settlement of the Miller action had effectively been negotiated by Casualty on behalf of the [insureds]. Consequently, the demand must, under the unique circumstances presented, be viewed not as a demand to defend the Miller action, but as a demand to contribute to a settlement. . . . [¶] . . . Casualty must be charged with the duty to exercise due diligence in determining the existence of 'other insurance' . . . . Where the insurer does not satisfy this affirmative obligation . . . , the insurer may not seek equitable contribution from a coinsurer." (902 F.Supp. at pp. 1239-1240.)

In *State of N.Y. v. Blank* (2d Cir. 1994) 27 F.3d 783, the Second Circuit Court of Appeals, applying New York law, explained: "[A]lthough the duty

of potential contribution. There is no basis for treating the officers differently than the entities.

[20]In a passing reference, Truck states that Unigard was not prejudiced by any delay in the demand for contribution. But Truck does not present any argument that a showing of prejudice was necessary. As a result, we need not consider ·the issue. (See *Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448 [37 Cal.Rptr.2d 126]; *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [33 Cal.Rptr.2d 838].) In any event, other cases involving contribution among coinsurers have applied principles of equity without using a prejudice test. (See, e.g., *Signal Companies, supra,* 27 Cal.3d 359; *American Continental Ins. Co. v. American Casualty Co.* (1999) 73 Cal.App.4th 508 [86 Cal.Rptr.2d 560].) In addition, we rely on the equitable principles furthered by the no-voluntary-payment provision, which does not require a showing of prejudice. (See *Jamestown Builders, supra,* 77 Cal.App.4th at pp. 349-350; *Faust v. The Travelers, supra,* 55 F.3d at pp. 472-473.)

to provide notice rests primarily upon the insured, a co-insurer hoping to benefit from the presence of another insurer, must ensure that . . . the second insurer [receives notice]. That is, if the insured fails to give notice to one co-insurer, the co-insurer that received notice must give notice to the co-insurer that did not. . . . [I]f the insured provided notice to only one co-insurer and if the co-insurer who received notice fails to give prompt notice to the co-insurer that did not, the co-insurer who received notice may not seek contribution from the [other] co-insurer . . . ." (*Id.* at p. 794, citation omitted.)[21]

As the Missouri Supreme Court has recognized, an insurer seeking contribution "must meet a test of reasonableness. In determining this issue the trier of fact may consider[, among other things,] . . . the presence or absence of notice to other carriers, and the discussions among the carriers . . . ." (*State Farm Mut. Auto. Ins. v. MFA Mut. Ins.* (Mo. 1984) 671 S.W.2d 276, 279.)

And in *United National Ins. v. Admiral Ins.* (U.S. Dist. Ct., E.D.Pa., Aug. 19, 1992, Civ. A. No. 90-7625) 1992 WL 210000, the court denied contribution, stating:

"A venerable maxim holds that '[h]e who seeks equity must do equity.' . . . In this regard, the courts have stated that the right to contribution is not absolute; it depends on an analysis of several factors, including 'the presence or absence of notice to other carriers.' . . .

"Consideration of notice in a contribution action . . . comports with the ever present specter of fairness subsumed in equity. It is unfair to ask co-insurers to contribute to a completed settlement when [they] have been given absolutely no prior opportunity to participate in or simply monitor the lawsuit or the settlement proceedings, regardless of the participation of counsel for . . . the settling insurer." (1992 WL 210000 at pp.*6-7, citations omitted.)

Nothing in *Meritplan Ins. Co. v. Universal Underwriters Ins. Co.* (1966) 247 Cal.App.2d 451 [55 Cal.Rptr. 561] compels a contrary result. The question there was whether an insurer could *ever* obtain contribution from a coinsurer. When *Meritplan* was decided, some courts were applying an overly broad "volunteer" rule to deny contribution. Under that rule, " '. . . where two insurance companies cover a risk of loss with "pro rata insurance," neither company may be forced to pay more than its share. If it does,

---

[21]In *Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1191 [77 Cal.Rptr.2d 537, 959 P.2d 1213], the Supreme Court criticized *State of N.Y. v. Blank* on another point.

the excess payment is purely voluntary and contribution cannot be claimed from the other. . . .' " (*Id.* at p. 463.)

In permitting contribution, the *Meritplan* court made a number of observations about the adverse consequences of such a broad rule. For example, the court noted that "[f]ailure to grant contribution unjustly enriches the unknown as well as the recalcitrant insurer." (247 Cal.App.2d at p. 467.) And, "failure to grant contribution[] would encourage a coinsurer to deny liability." (*Ibid.*) Plainly, those observations are no longer pertinent in light of the subsequent demise of the broad volunteer rule at issue in *Meritplan*. (See *Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra,* 65 Cal.App.4th at pp. 1289-1290, 1293-1295 & fn. 5 [insurer has right of contribution against coinsurers where it has paid more than its share of loss]; *State Farm Fire & Casualty Co. v. East Bay Municipal Utility Dist.* (1997) 53 Cal.App.4th 769 [62 Cal.Rptr.2d 72] [finding volunteer rule inapplicable]; *California Food Service Corp. v. Great American Ins. Co.* (1982) 130 Cal.App.3d 892, 901, fn. 4 [182 Cal.Rptr. 67] ["Numerous decisions over the past 25 years have cast considerable doubt on the logic of the [volunteer rule]."].)

Moreover, it can hardly be said that Unigard was unknown, recalcitrant, or unjustly enriched. Nor did Unigard deny liability; it was never tendered the defense in the *Cimarron* cases. Finally, the court in *Meritplan* was concerned that both insurers might deny coverage (247 Cal.App.2d at p. 467), an issue of no concern here. Truck accepted the tender of defense in the *Cimarron* cases, and, if Truck had not done so, Unigard most likely would have provided a defense had a tender been made.

Based on the foregoing analysis, we conclude that Truck was not entitled to contribution from Unigard with respect to the *Cimarron* cases.[22]

B. *Vista del Flores* and *Sunset Townhomes*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed. On remand, the trial court shall not (1) award any damages based on the underlying litigation in *Cimarron Oaks VI v. The*

---

[22]Given the basis for our opinion, we do not address the remainder of Unigard's arguments, e.g., the statute of limitations barred Truck from recovering some of the defense costs.
 \*See footnote, *ante*, page 966.

*Anden Group* (Super. Ct. San Bernardino County, 1991, No. RCV059099) and *Cimarron Oaks XI v. The Anden Group* (Super. Ct. L.A. County, 1991, No. KC004708), or (2) award prejudgment interest pursuant to Civil Code section 3287, subdivision (a). The trial court shall reallocate the loss between the parties in accordance with this opinion. Appellant is entitled to costs on appeal.

Ortega, Acting P. J., and Vogel (Miriam A.), J., concurred.