[No. B179005. Second Dist., Div. Two. Aug. 16, 2006.]

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE
COMPANY et al., Plaintiffs and Appellants, v.
CONTINENTAL CASUALTY INSURANCE COMPANY et al., Defendants
and Respondents.

1346

COUNSEL

McCormick, Barstow, Sheppard Wayte & Carruth, James P. Wagoner, Jay A. Christofferson and David W. Burnett for Plaintiffs and Appellants.

Woolls & Peer, John E. Peer and Beth E. Yoffie for Defendant and Respondent Continental Casualty Insurance Company.

Greenan, Peffer, Sallander & Lally, James S. Greenan, John P. Makin and Nelson S. Hsieh for Defendant and Respondent Gulf Underwriters Insurance Company.

Gray & Prouty, Malcolm D. Schick and David J. Gittelman for Defendant and Respondent Admiral Insurance Company.

OPINION

**ASHMANN-GERST, J.**—The question presented is whether respondents Continental Casualty Insurance Company (Continental), Gulf Underwriters Insurance Company (Gulf), and Admiral Insurance Company (Admiral) (collectively objecting insurers) are liable for equitable indemnity or equitable contribution to appellants American International Specialty Lines Insurance Company (American) and Lexington Insurance Company (Lexington) (collectively settling insurers). The settling insurers paid $21.5 million to fund a settlement and $3,214,612 in defense costs on behalf of Walt Disney Company (Disney) (the insured of Continental, American and Lexington) in connection with an action by Goto.Com, Inc. (Goto.com), against Disney and Infoseek Corporation (Infoseek) (the insured of Gulf and Admiral). The settling insurers sued the objecting insurers, who then moved for summary judgment, inter alia, due

to lack of notice of the Goto.com action and settlement to Continental, and lack of coverage on the part of Gulf and Admiral. Summary judgment was entered for the objecting insurers, and the settling insurers appeal. We find no error and affirm the judgment.

## CONTENTIONS

According to the settling insurers:

1. Even if Continental did not have notice of the Goto.com action, there is a triable issue as to whether notice was required. Under Continental's insurance policy, Disney was excused from providing notice of the Goto.com action if it had a reasonable belief that the occurrence, injury or offense was not covered. Disney reasonably believed it was not covered, so notice was not required.

2. The trial court erred when it ruled that Continental did not receive notice of the Goto.com action prior to Disney's settlement. There was a triable issue as to whether Continental received constructive notice of the Goto.com action through AON Risk Services, Inc. (AON).

3. Because Continental had no right to control Disney's defense, notice would not have changed the settlement. As a result, Continental cannot avoid its equitable duty to contribute to the settlement.

4. The trial court improperly relied on *Truck Ins. Exchange v. Unigard Ins. Co.* (2000) 79 Cal.App.4th 966 [94 Cal.Rptr.2d 516] (*Unigard*) in ruling that Continental's nonvoluntary payment clause was a defense to the settling insurers' claims. *Unigard* is distinguishable and should not be applied to this case.

5. The trial court erroneously applied the provision in Gulf's insurance policy that excluded coverage if Infoseek had prepolicy knowledge of circumstances that could lead to an insurance claim. There are triable issues as to Gulf's duty to defend because Infoseek might not have known of a prior wrongful act before the February 12, 1999, inception date of Gulf's insurance.

6. Even if Infoseek was not entitled to coverage for prior wrongful acts, Gulf was required to provide a defense for wrongful acts occurring within the policy period. The trial court erred when it concluded that all Infoseek's wrongful acts should be treated as one prior wrongful act.

7. Admiral, which issued an excess policy that followed form to Gulf's insurance, breached a contractual duty to conduct an investigation and determine coverage. Admiral must contribute to the settlement because the allegations of the Goto.com action triggered Admiral's insurance policy.

## FACTS

*Goto.com*

In December 1997, Goto.com began operating a search engine with the Internet address "www.goto.com." Goto.com's word marks were GOTO and GOTO.COM and its design mark (mark) displayed the words Go and To in white letters in the center of a green circle on a yellow background.

*Continental, American and Lexington issue policies to Disney*

Continental issued a $2 million general liability policy (the Continental policy) to Disney for the policy period June 30, 1997, through June 30, 2000. The Continental policy provided coverage for advertising injury. Lexington issued a $10 million media wrap-up policy (the Lexington policy) to Disney for the period June 30, 1998, through June 30, 2001, and promised to pay all loss that Disney became legally obligated to pay resulting from, inter alia, misappropriation or unauthorized use of a trademark or service mark, and unfair competition involving the misuse of matter. Under the Lexington policy, it was Disney's duty to defend against claims brought against it. Finally, American issued a $50 million excess liability policy (the American policy) to Disney for the period June 30, 1998, through June 30, 2001. With respect to media professional liability, the American policy contained an endorsement stipulating that the insurance it provided followed form to the Lexington policy and the Continental policy.

The Continental policy required Disney to notify Continental of any claim for advertising injury if Disney estimated that the defense costs and liability exceeded 50 percent of the retention. The retention was $250,000 for each occurrence with respect to advertising injury.

*Infoseek obtains an application for insurance with Gulf*

Infoseek's agent solicited insurance from Media/Professional Insurance. Media/Professional Insurance wrote back and requested, inter alia, that

Infoseek sign and date an application. A copy of Gulf's specialty errors and omissions plan application was forwarded.

*Disney acquires Infoseek stock; they launch the go.com search engine*

Disney acquired 43 percent of the stock of Infoseek and an option to obtain a majority interest. On December 13, 1998, Disney and Infoseek launched a beta test version of a search engine called go.com. They promoted the search engine with the word mark GO and a design mark with GO appearing in the center of a green circle against a yellow background (infringing mark). The words were in white and used the same font used in the mark. Disney's Buena Vista Internet Group (Buena Vista) worked with Infoseek on go.com.

*Goto.com's cease-and-desist demand and the parties' subsequent negotiations*

Because the mark and infringing mark were similar, an attorney for Goto.com wrote to the business and legal affairs department of Buena Vista. The attorney informed Buena Vista that Goto.com was the owner of the mark and the GOTO and GOTO.COM word marks, and that the mark and infringing mark were confusing to consumers. According to the attorney for Goto.com: "Disney's use of the GO word mark and [infringing mark] in connection with its [Internet] services constitutes, among other things, a violation of Section 43(a) of the Lanham Act, [title 15 United States Code section] 1051, et seq., as well as violations of applicable state statutory and common law. [¶] We therefore demand, on behalf of [Goto.com], that Disney provide us with written assurances by no later than the close of business on Friday, January 8, 1999, that it will immediately cease and desist from all use of the GO word mark, the [infringing mark] and any similar marks. [¶] [Goto.com] will take any and all steps to protect its intellectual property rights. If we do not receive the requested written assurances by Friday, January 8, 1999, [Goto.com] will reasonably assume that Disney does not intend to comply with the request, and [Goto.com] will feel free to pursue any and all remedies available to it under applicable federal and state law to protect its intellectual property rights." (Italics omitted.)

On January 11, 1999, a Goto.com attorney spoke to Buena Vista, which revealed that personnel at Disney were adamant that they try to find a business solution to the dispute. According to Buena Vista, they needed to sit down and talk to Infoseek's chief executive officer and Disney.

On January 15, 1999, Disney sent an e-mail to the chief executive officer of Goto.com. The e-mail stated that Disney was "coordinating availability of the appropriate Infoseek people so we can set up a meeting for next week." A subsequent e-mail from the Goto.com chief executive officer to Goto.com addressees forwarded a draft discussion document that was received from Larry Shapiro. That e-mail stated: "The next step is to meet with InfoSeek [sic] on Monday to hammer out an agreement along the lines of this document."

The "Go Network and [Goto.com] Partnership Opportunities Discussion Document," which was dated January 15, 1999, set forth a nonbinding outline of discussions regarding potential business partnership opportunities between Disney's Buena Vista and Infoseek on one hand, and Goto.com on the other hand. The discussion document provided, in part, (1) "[s]everal potential product integration and business opportunities are being discussed, which will be further explored with the Infoseek product and business development team"; (2) "[a]ny business opportunity is subject to successful negotiation with Infoseek"; (3) "[Goto.com] and [Infoseek and Buena Vista] will explore potential revenue sharing from the services provided by [Goto.com] within the Go Network or other joint economic incentives around these opportunities"; and (4) "[Goto.com] [Buena Vista] and Infoseek will meet to explore these and other opportunities to integrate [Goto.com] products and/or technologies into the Go Network as appropriate."

Eric Bochner (Bochner) of Infoseek attended discussions between the parties about forming a business relationship. Goto.com indicated that it would consider litigation to enforce its rights.

Goto.com sent Disney an e-mail on February 4, 1999, and said "it is looking unlikely that we will reach a business solution to our mutual problem." Disney personnel replied with an e-mail on February 5, 1999, that stated: "I was at an Infoseek board meeting today. I heard from my team that they were awaiting your response to our proposal." Bochner sent a nonbinding proposal to Goto.com on February 8, 1999, that proposed, among other things, that Infoseek and Goto.com create Go Network Commercial Listing Service. One of the provisions provided: "Any agreement arising out of this proposal would be by and among [Goto.com], Infoseek and [Disney] and would be subject to mutual written agreement among the parties (settlement of all potential claims, releases, etc. . . .)."

Goto.com, Disney and Infoseek began working on a tolling agreement. The first draft, signed by Infoseek on February 10, 1999, stated in part: "On December 22, 1998, [Goto.com] wrote a letter to [Disney], alleging infringement (the 'Claim') of [Goto.com's] trademark rights by the Go

Network, which is a venture of Disney, [Infoseek], and their related companies. . . . [¶] In the month since January 8, 1999, [Goto.com], Disney and Infoseek have engaged in settlement discussions in an effort to achieve a mutually acceptable business solution to the dispute. The parties desire to continue these discussions. At the same time, [Goto.com] desires to preserve its right to seek preliminary injunctive relief if the continuing discussions do not succeed in resolving the dispute." The first draft of the tolling agreement set forth a 14-day extension and provided that Goto.com would give Disney and Infoseek 24 hours' notice of the filing of any lawsuit. Subsequently, Infoseek signed another draft of the tolling agreement on February 12, 1999.

### The Goto.com action

On February 18, 1999, Goto.com sued Disney[1] and Infoseek for federal false designation of origin, statutory unfair competition under Business and Professions Code section 17200 et seq., and common law unfair competition. Goto.com alleged: It is the owner of the mark. On December 13, 1998, Infoseek, through a partnership with Disney (the partnership), started a beta Internet service, including a search engine component. The partnership launched its service in 1999, which can be reached at go.com. The partnership promoted its Internet service using the infringing mark. In both the mark and infringing mark, the word "GO" is in white capital letters and appears inside a green circle, which is placed on a yellow background. The font for the letters in the mark and infringing mark are the same. Both marks can be viewed as a traffic light. The partnership's promotion, advertising and maintenance of Internet service with a search engine under the infringing mark is likely to confuse the public as to the source of its Internet service and as to whether there is an association between it and Goto.com. "On December 22, 1998, prior to the formal launch of [the partnership's] service under the [infringing mark], [Goto.com] demanded that use of the [infringing mark] cease. During the period through February 16, 1999, the parties engaged in negotiations for a business solution to the dispute."

### Notice of the Goto.com action to Gulf and Admiral

Even though Infoseek had not yet sent in its application for insurance with Gulf, Infoseek's broker, ABD Insurance, sent a letter to Gulf on March 4, 1999, informing it of the Goto.com action. In pertinent part, the letter stated: "May this serve as the first notice of claim under the" Gulf policy. ABD Insurance sent a similar letter placing Admiral on notice.

---

[1] Goto.com also sued Disney Enterprise, Inc., and Montrose Corporation, which were subsidiaries of Disney.

*Infoseek's application with Gulf, the Gulf policy and the Admiral policy*

Infoseek completed its application for insurance with Gulf on March 31, 1999. Part 11 of the application, entitled "Claim Experience" asked whether any claims or suits had been instituted against Infoseek in the past five years. Infoseek responded in the affirmative. It also asked: "Are any of You aware of any actual or alleged fact, circumstance, situation, error or omission which may reasonably be expected to result in a claim being made against You . . . ?" This time, Infoseek answered in the negative. However, in a March 23, 1999, document entitled "Supplemental Claim Information," which formed part of the application, Infoseek indicated that Goto.com was a claimant and that it had a trademark infringement case "claiming Go Network logo infringes [Goto.com] logo." The document listed Goto.com's settlement demand as $9 million, and it stated that a complaint had been filed and that the answer was due on March 11, 1999. One of the boxes on the document asked for the date of the alleged error or occurrence or, alternatively, for the contract date. In that box, Infoseek wrote "December 1998."

Infoseek's completed application was received by Media/Professional Insurance on April 6, 1999.

Gulf insured Infoseek under a specialty errors and omissions liability policy (the Gulf policy) for the policy period February 12, 1999, through January 5, 2000, with a retroactive date of March 10, 1997. Coverage was afforded in the amount of $5 million for each wrongful act with a $100,000 deductible for each wrongful act. The Gulf policy covered infringement of a trademark, service mark, and, when related, unfair competition. Admiral provided insurance under an excess policy (the Admiral policy) to which the Gulf policy was specified as the primary insurance. The policy limits were $5 million per occurrence. With some exceptions, the Admiral policy followed form to the Gulf policy.

In particular, the Gulf policy provided: "We will cover a written Claim first made against any of You arising from a Wrongful Act committed between [March 10, 1997] and [February 12, 1999] of the policy, but only if all of the following conditions are met: [¶] (1) The written Claim is first made against any of You during the Policy Period. We will consider a Claim to be first made against You when a written Claim is received by any of You; [¶] (2) None of You knew prior to [February 12, 1999] of a circumstance that could reasonably be expected to lead to the Claim; and [¶] (3) There is no other valid and collectible insurance for the Claim."

As defined in the Gulf policy, a wrongful act means, inter alia, a negligent act, error or omission. Also, related wrongful acts are aggregated. The Gulf

policy provides: "All Wrongful Acts that: [¶] 1. Take place between [March 10, 1997] and the end of the Policy Period of the last policy We issue to You, and [¶] 2. Are related by common facts, circumstances, transactions, events and/or decisions [¶] will be treated under this policy as one Wrongful Act."

*Media/Professional Insurance investigates Infoseek's claim on behalf of Gulf*

Gretchen Sayers (Sayers), a senior claims manager for Media/Professional Insurance, investigated Infoseek's claim. She sent a letter to Infoseek on April 6, 1999, stating, in part, that it appeared that the claim was not covered because Infoseek had knowledge of the dispute with Goto.com in December 1998 due to the cease-and-desist demand. She indicated that she could not make a coverage determination without additional information.

On June 15, 1999, Sayers received a facsimile from Duane K. Ludwig (Ludwig) of Sedgwick of California, Inc., Infoseek's new broker. Ludwig wrote that "Infoseek first learned of this matter via contact from a representative of the Disney company on/about January 19, 1999." He went on to state: "You will note the lawsuit doesn't aver that [Goto.com] made a demand of Infoseek to stop using the [infringing mark]. The cease and desist demand was directed to Disney and not to Infoseek." Ludwig did not deny that Infoseek had prepolicy knowledge of a circumstance that could reasonably be expected to lead to a claim against Infoseek.

Sayers wrote to Ludwig on October 4, 1999, stating that she had not received responses to her letters of July 9, 1999, and September 14, 1999, both of which requested information. She warned Ludwig that, "[a]s previously advised, we cannot evaluate coverage for this claim until we receive the requested information." She referenced the cooperation clause in the Gulf policy and wrote that "the insured has a duty to provide information that we need to evaluate this claim. Failure to provide that information may be considered a breach of the insurance contract and may affect coverage under the policy. [¶] If we have not heard from you by October 25, 1999, we will assume you and the insured have determined not to pursue coverage for this claim and we will close our file."

In response, Ludwig advised Sayers to make personal contact with Infoseek's general counsel, or Infoseek's retained counsel, "to ascertain the status of this matter." He suggested that because Disney had assumed Infoseek's defense, it would be "the better course of action . . . to postpone any further investigation of coverage you deem necessary rather than arbitrarily closing your file." Sayers did not make any further contact because "[i]t seemed useless."

*The preliminary injunction against use of the infringing mark*

A federal district court granted Goto.com's motion for preliminary injunction on November 12, 1999, and then amended the preliminary injunction to allow Disney to phase out its use of the logo. The Ninth Circuit issued a stay pending appeal, then lifted the stay and reinstated the preliminary injunction. (*GoTo.com, Inc. v. Walt Disney Co.* (9th Cir. 2000) 202 F.3d 1199, 1204, 1211.) According to the Ninth Circuit, Goto.com had demonstrated a likelihood of success on the merits and the possibility of irreparable injury. (*Id.* at p. 1209.)

*The May 25, 2000, settlement between Goto.com, Disney and Infoseek*

Disney and Infoseek agreed to the delivery of $21.5 million to Goto.com in exchange for a dismissal of the Goto.com action and mutual releases.

*Notice of the Goto.com settlement to Continental*

Counsel for American wrote to Continental, pointed out that the Continental policy was listed on the American policy's schedule of underlying insurance, and stated that the American policy was excess. American's counsel opined that Continental was obligated to indemnify Disney.

Continental never responded.

*American's January 9, 2001, letter to Disney*

American wrote to Disney regarding the proper calculation of Goto.com's damages. It was American's belief that Disney could have settled with Goto.com in March 1999 for $9 million. Moreover, it appeared to American that Disney paid $21.5 million in part to avoid criminal liability for contempt after Disney violated the preliminary injunction issued in federal district court. American indicated that it and Lexington were offering $14 million as full settlement in exchange for subrogation rights against other carriers.

American disputed Disney's claim that there was no objection to the $21.5 million settlement and that "Disney would have abandoned the prospect of settlement had [American] objected." American went on to aver: "That settlement was a *fait accompli* at the time Disney brought it to the attention of Lexington and [American] on April 25, 2000. In addition, [American] sent a letter . . . on May 11, 2000, in which [American] expressly declined to consent to the settlement. The letter states in pertinent part: [¶] [']Under the present circumstances with essentially no knowledge of the precise terms of the settlement, the consideration that went into the settlement or its

reasonableness, [American] is not prepared to give its consent to this settlement at this time.' [¶] Disney inked the final settlement agreement two weeks later without making any effort whatsoever to obtain [American's] consent. [¶] Separate provisions in the Lexington and [American] policies bar insurance coverage for settlements made without the consent of Lexington or [American]." In American's view, the facts surrounding the settlement showed that Disney made a voluntary payment and that it should accept American's compromise offer.

*Lexington and American reimburse Disney*

On February 20, 2001, Lexington and American reimbursed Disney for the settlement amount and its defense fees.

*This action*

The settling insurers sued the objecting insurers for declaratory relief, equitable indemnity, equitable subrogation and equitable contribution. The settling insurers' first amended complaint alleged: Continental's authorized representative, AON, received notice of the Goto.com action on August 25, 1999. As a result, Continental received timely notice of Disney's claim. The settling insurers demanded that the objecting insurers contribute to the settlement and defense costs in the Goto.com action, but they refused.

Continental sought summary judgment on the grounds that Disney failed to provide notice of the trademark infringement and the Goto.com suit. Also, Continental argued that the settling insurers could not obtain contribution because Disney made a voluntary payment without consent.

In its summary judgment motion, Gulf claimed that the Goto.com complaint made it clear that Goto.com's claim existed, and was known by Infoseek, before the inception date of the Gulf policy on February 12, 1999. Also, Gulf claimed that prior to the inception date, Infoseek knew of the wrongful act that led to the Goto.com action. Gulf argued that coverage was excluded because its policy did not cover prepolicy claims known by Infoseek, or claims made during the policy period based on prior wrongful acts that were known. Last, Gulf argued that Infoseek's violation of the nonvoluntary payment clause precluded coverage.

Because Admiral provided Infoseek with an excess insurance policy that followed form and was excess to the Gulf policy, Admiral's motion for summary judgment mirrored the arguments in Gulf's motion.

It was undisputed that Disney knew that the Goto.com action was filed against it on February 18, 1999, but that Disney settled the case without

directly notifying Continental of the suit or the settlement. According to the trial court, the evidence showed that AON was Disney's broker. The trial court rejected the settling insurers' contention that AON's notice to American constituted notice to Continental. As a result, the trial court granted Continental's motion. In ruling that Gulf was entitled to summary judgment, the trial court adverted to the allegation in the Goto.com complaint that Goto.com sent a cease-and-desist letter on December 18, 1998, and to the June 15, 1999, letter from Ludwig admitting that Infoseek had knowledge of the Goto.com matter on January 19, 1999. The trial court found that Infoseek was aware of an actual or alleged fact, circumstance, situation, error or omission which could reasonably be expected to result in a claim being made against Infoseek prior to February 12, 1999. Thus, coverage was excluded under the terms of the Gulf policy. Because the Admiral policy was excess to the Gulf policy and followed form, the trial court entered summary judgment for Admiral also.

This timely appeal followed.

## STANDARD OF REVIEW

When summary judgment is challenged on appeal, we review the trial court's ruling de novo. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].) In doing so, we employ a three-step analysis. "We first identify the issues framed by the pleadings, since it is these allegations to which the motion must respond. Secondly, we determine whether the moving party has established facts which negate the opponents' claim and justify a judgment in the movant's favor. Finally, if the summary judgment motion prima facie justifies a judgment, we determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citation.]" (*Torres v. Reardon* (1992) 3 Cal.App.4th 831, 836 [5 Cal.Rptr.2d 52].)

## DISCUSSION

1. *The settling insurers' action against Continental is barred because Disney failed to give Continental notice of the Goto.com action, and because Disney settled without Continental's consent.*

The settling insurers contend: (1) the Continental policy did not require notice if Disney had a reasonable belief that there was no coverage; (2) notice to AON was notice to Continental; and (3) under the facts of this case, the principles of equity are triggered and require contribution.

We disagree.

### a. The Continental policy.

Continental issued a commercial general liability excess indemnity insurance policy to Disney, effective June 30, 1997, to June 30, 2000. The declarations page specified that there was a $2 million limit of insurance for personal and advertising injury, with a $2 million general aggregate limit of insurance per location. The insuring agreement provided: "We will indemnify [Disney] for the 'ultimate net loss' in excess of the 'retained limit' which the insured becomes legally obligated to pay as 'damages' because of bodily injury,' 'property damage,' 'personal injury,' 'advertising injury,' or 'injury' to which this insurance applies." The Continental policy defined advertising injury to include "[m]isappropriation of advertising ideas or style of doing business." Insurance for advertising injury was subject to a $250,000 retention under the catchall retention for types of liabilities not specified.

Part 5 of the conditions section of the Continental policy set forth Disney's duties in the event of an occurrence, injury, offense, claim or suit. Subpart 5(a) required Disney to notify Continental of *any* claim for, inter alia, advertising injury in which the estimated defense costs and liability exceeded 50 percent of the retention. Subpart 5(c) provided: "Your rights under this policy shall not be prejudiced if there is a failure to give notice of an 'occurrence,' 'injury,' or 'offense' due solely to your reasonable belief that the injury or damage is not covered under this policy or did not appear likely that the 'occurrence,' 'injury,' or 'offense' would meet or exceed the required notice provisions of (a) above." Subpart 5(d) stated that if a suit was brought against Disney that may result in a claim against the Continental policy, then Disney had to see to it that Continental received notice of the suit after reporting the suit to the risk manager or employee it designated to give notice to Continental.

Further, the conditions section specified that Disney "shall make no settlement for any sum in excess of the 'retained limit' without our prior written approval." It also specified that Continental would pay for ultimate net loss only after Disney's liability was established by a trial court's decision, or there was an agreed settlement between the claimant, Disney and Continental. In the subpart of the conditions section entitled "Legal Action Against Us," the Continental policy stated that a "person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial. We will not be liable for 'damages' that" are not payable under the terms of the Continental policy or are in excess of the applicable limits of insurance.

The Continental policy contained endorsements called the Utah Changes, Indiana Changes, Texas Changes and Puerto Rico Changes.

### b. Notice of a suit was required.

Without application of law to fact, the settling insurers argue that notice was not required in this case because it presented evidence that Disney did not believe that the Continental policy afforded coverage for the occurrence. They contend that "[i]t would thus be unreasonable to interpret [the Continental policy] to require notice of a 'suit' when the insured . . . believed that the policy provided no coverage for the 'occurrence' alleged" in the suit.

The failure of an appellant to support an argument with proper legal citations triggers a waiver, thereby undermining an appeal. The Court of Appeal has no obligation to lend its expertise to an appellant, i.e., do the necessary research and formulate a winning argument. (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11 [122 Cal.Rptr.2d 890].) By failing to discuss and apply the principles of contract interpretation and the law pertaining to insurance policies to the notice provisions, the settling insurers waived this portion of their appeal.

On our own, we analyze the issue, but the exercise is academic.

■ Our analysis is guided by these principles. Though insurance policies "have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. . . . The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. . . . If contractual language is clear and explicit, it governs. . . . On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.] This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' [Citation.] Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. . . . [¶] In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. . . . This is because '*language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*' " (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264–1265 [10 Cal.Rptr.2d 538, 833 P.2d 545], citations omitted (*Bank of the West*).)

■ An insurance policy provision is ambiguous when it is capable of two or more constructions, both of which are reasonable. (*Bay Cities Paving &*

*Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) Our task is to determine whether a particular phrase is ambiguous in "the context of *this* policy and the circumstances of *this* case. [Citation.] 'The provision will shift between clarity and ambiguity with changes in the event at hand.' [Citation.]" (*Id.* at p. 868.) Finally, "[w]ords used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].)

The settling insurers do not suggest that subparts 5(a) and 5(d) of the conditions section in the Continental policy are ambiguous on their face, or in the context of the entire policy. This is with good reason.

When subparts 5(a) and 5(c) are read together, it is clear that an insured is supposed to report an occurrence, injury or offense that might give rise to a claim under the policy, but there will be no forfeiture of rights for the failure to give notice if the insured has a reasonable belief that the damage caused by the occurrence, injury or offense is not covered under the policy.

On the other hand, when subparts 5(a) and 5(d) are read together, it is equally clear that the insured must report a third party claim against it if it might result in an insurance claim being made against the Continental policy and if the estimated defense costs and liability exceed 50 percent of the retained limit. There is no reasonable belief exception for reporting third party claims.

The provisions are materially different, which explains why they are given different treatment. When there is an occurrence, injury or offense but no claim or suit, the damage of the third party involved, and its intent to seek redress, may be highly speculative. For this reason, the insured is given some leeway in its reporting duties. However, once the third party makes a claim or files suit, the stakes are raised and part of the guesswork is eliminated. The insured is instantly required to critically assess its exposure in light of an actual dispute.

We note that the idea of conflating subparts 5(c) and 5(d) is unreasonable and untenable because, in a given case, it might absolve an insured from any obligation of notifying Continental of a claim or suit. This could unfairly defeat Continental's opportunity to investigate its exposure.

### c. Continental did not receive notice through AON.

The Continental policy contained an endorsement entitled "Utah Changes" that amended the conditions in subpart 5 to include the sentence: "Notice to our authorized representative is notice to us."

The settling insurers argue that the application of the Utah Changes endorsement is not limited to the State of Utah. In their view, the Utah Changes endorsement modified the Continental policy without restriction such that it applies in California, where the Goto.com action was filed. In the alternative, the settling insurers contend that because the Goto.com action alleged wrongful acts by Disney on the Internet, it effectively alleged that such acts partly occurred in Utah. For that reason, they contend that the Utah Changes endorsement is implicated. As a result, they contend that Disney's notice of the Goto.com action to AON was notice to Continental on the theory that AON was Continental's authorized representative.

We disagree.

In *John Akridge Co. v. Travelers Companies* (D.D.C. 1993) 837 F.Supp. 6 (*Akridge*), the case relied upon by the settling insurers, the policy at issue insured property in Virginia, Maryland and the District of Columbia. When the insured sued for coverage, the insurer asserted the two-year contractual statute of limitations in the policy. The insured countered by pointing to an endorsement entitled Maryland Changes which purported to change the policy and stated that the insurer could not be sued unless an action was brought within three years. (*Id.* at pp. 6–9.) The court decided the case in favor of the insured, stating: "This Court interprets the suit limitations provision of the contract and the attached endorsement to mean that the instant lawsuit is not time-barred. The plain language of the endorsement changes the suit limitation provision of the policy. Although the endorsement is titled 'Maryland Changes' and neither party disputes that the endorsement was created to conform the policy to the Maryland statute of limitations with regard to contract claims, no language in the endorsement limits its application to insured property located in Maryland. [¶] Moreover, as plaintiff points out, had Travelers wished to limit its endorsement to insured property located in Maryland, it was more than capable of doing so. . . . [¶] . . . [¶] It is axiomatic that a contract will be construed against its drafter. [¶] . . . [¶] . . . This Court finds that the suit limitations provisions of the insurance policy was modified by the 'Maryland Changes' endorsement to create a three-year limit on suits under the policy." (*Id.* at p. 8.)

We, of course, are free to consider *Akridge*, but we would do so only if we found its reasoning compelling. Its reasoning is not compelling because it is

cursory and does not employ our state's interpretive rules. Suffice it say, we are obligated to tackle this issue from a clean slate.

To interpret the endorsements in the manner espoused by the settling insurers would read out the references to specific places in other endorsements. However, we are supposed to give effect to every part of a contract, if reasonably practicable. (Civ. Code, § 1641.) It is practicable to give the references to specific places effect by interpreting each endorsement as applying only to claims or suits made or filed in a specified place. Also, we note that words are to be interpreted in their ordinary and popular sense. (Civ. Code, § 1641.) The Indiana Changes, Utah Changes, Puerto Rico Changes, and Texas Changes connote changes that are specific to those places. Because the language targets specific places, we must respect that language. (*Bank of the West, supra,* 2 Cal.4th at pp. 1264–1265.) Aside from that, we can use language from other parts of the Continental policy to help interpret particular clauses. (Civ. Code, § 1641.) The Indiana Changes require notice to Continental's authorized representatives in Indiana, thus indicating that the Indiana Changes endorsement is intended to apply only to claims and suits made and filed in Indiana. To be consistent, we interpret the Utah Changes as being similarly limited.

Regardless, the settling insurers failed to demonstrate that AON was Continental's authorized representative with respect to the Continental policy. The settling insurers refer us to a document from the California Department of Insurance that sets forth license status information for AON. The document shows that at the relevant time, AON was licensed to transact business on behalf of a multitude of insurance companies. AON was licensed to transact business on behalf of "Continental Casualty Company" with respect to disability and fire and casualty. Even assuming that Continental Casualty Company and Continental are one and the same, we fail to see how AON was Continental's agent for purposes of the commercial general liability excess indemnity insurance policy that was issued to Disney.

Weighing in on the matter, Continental points out that when a Disney witness was deposed, he testified that AON was paid to be Disney's broker. AON submitted communications with Continental on Disney's behalf. An AON witness testified in his deposition that AON was compensated by Disney with respect to the work on the Disney account. A Lexington witness testified that because an insurance company cannot deal directly with an insured, Lexington has to deal with a representative of the insured and that AON was Disney's representative with respect to Disney's dealings with Lexington. When one of American's employees testified, she similarly stated that AON functioned as Disney's broker and that a broker represents the insured.

Continental admits that it entered into an agency agreement with AON, but Continental explains that the agency was limited. In part I(C) of the agency agreement, AON was given the authority to bind, execute and issue the kinds of insurance to which the agency agreement applied, and only as authorized in writing. AON was given no binding authority for business written through the risk management group, or for any class of insurance that did not have a rate of commission in the schedule attached to the agency agreement. Pamela R. Gillette, general counsel and vice-president at Continental, submitted a declaration in connection with Continental's motion for summary judgment. She declared that the Continental policy was written through Continental's risk management division.

The evidence shows that AON was Disney's broker, not Continental's agent. This is also borne out by the applicable statutes.

As statutorily defined, an " '[i]nsurance broker' means a person who, for compensation and on behalf of another person, transacts insurance other than life with, but not on behalf of, an insurer." (Ins. Code, § 33.) In contrast, an " '[i]nsurance agent' means a person authorized, by and on behalf of an insurer, to transact all classes of insurance other than life insurance." (Ins. Code, § 31.) Because AON represented Disney in connection with procuring the Continental policy, AON fits the definition of an insurance broker. AON was not authorized by Continental to transact all classes of insurance, just disability and fire and casualty. Therefore, AON does not fit the statutory definition of an insurance agent.

Separate from *Akridge*, the settling insurers advert to *Fireman's Fund Ins. Co. v. Nat. Bank for Cooperatives* (N.D.Cal. 1994) 849 F.Supp. 1347 (*National Bank*). The policy at issue in *National Bank* had two notice provisions. The first required notice to the insurance company or its authorized representative, and the second permitted notice to the insured's agent. The two notice provisions were in conflict, which created an ambiguity. The court interpreted the ambiguity against the insurer and concluded that notice to the insured's agent was sufficient based on the second notice provision. (*Id.* at pp. 1364–1365.)

The settling insurers' citation to *National Bank* is unavailing insofar as the Continental policy does not have an ambiguity permitting us to find that notice could be given to Disney's agent.[2]

---

[2] According to the settling insurers, the trial court erred when it disregarded the expert declaration of John Pratt. They contend that Mr. Pratt declared that AON had a duty to notify Continental of the Goto.com action. We decline to reach this issue. Whether AON had such a duty is irrelevant. The only material issue is whether AON was Continental's agent.

#### d. The voluntary payment extinguished Continental's liability.

While the settling insurers concede that the lack of notice provides Continental with a defense to their claims for declaratory relief, equitable indemnity and equitable subrogation, they contend that they still have a claim for equitable contribution. We disagree. Despite the settling insurers' protestations to the contrary, we conclude that the trial court correctly applied *Unigard*.

##### (1) Equitable contribution law.

When a surety satisfies the obligation of a principal, it may sue one or more of its cosureties for contribution without regard to the order of time they became sureties. (Civ. Code, § 2848.) If a surety pays more than its proportionate share, it can sue its cosureties on the theory that there is an implied contract that obligates them to share the risk equally. (See 25 Cal. Forms of Pleading and Practice (2006) Indemnity, § 300.91[5], p. 300-111, citing *Overholser v. Glynn* (1968) 267 Cal.App.2d 800, 807 [73 Cal.Rptr. 628] [a guarantor that paid more than its fair share may sue coguarantors on an implied contract theory to obtain proportionate contribution].)

##### (2) Unigard.

In *Unigard*, an insured faced with multiple lawsuits tendered the defense to one of its insurers. After defending and indemnifying the insured, the insurer sued a coinsurer for equitable contribution. Even though the coinsurer was not tendered the defense or placed on notice of the insurer's claim for equitable contribution, the trial court held that the coinsurer was liable. The *Unigard* court reversed, holding that the insurer should have notified the coinsurer of the possibility of contribution. (*Unigard, supra*, 79 Cal.App.4th at pp. 970, 973.)

*Unigard* noted that reciprocal contribution rights are based on the principle that the burden of indemnifying or defending an insured should be distributed equitably among the insurers on the risk. Further, the court observed that the right to contribution " 'do[es] not arise out of contract, for [the coinsurers'] agreements are not with each other . . . . Their respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden. As these principles do not stem from agreement between the insurers[,] their application is not controlled by the language of their contracts with the respective policy holders." ' [Citation.]" (*Unigard, supra*, 79 Cal.App.4th at p. 974.) Generally, however, "absent compelling equitable reasons, courts should not impose an obligation on an insurer that contravenes a provision in its insurance policy. [Citation.]" (*Ibid.*)

Because equitable considerations vary, our Supreme Court has declined to formulate a definitive rule for when contribution should be compelled between insurers. (*Unigard, supra,* 79 Cal.App.4th at p. 974.) "In determining whether one insurer is entitled to contribution from another, ' "[c]ourts should consider the nature of the claim, the relation of the insured to the insurers, the particulars of each policy and any other equitable considerations." ' [Citations.]" (*Ibid.*)[3]

### (3) Application of *Unigard.*

The settling insurers argue that the principles of equity compel Continental to contribute to the settlement.[4]

We turn to the issues.

Our first topic is the particulars of the Continental policy. Following the lead of the *Unigard* court, we focus on three provisions. (*Unigard, supra,* 79 Cal.App.4th at p. 974.) The Continental policy obligated Disney to provide prompt notice of suits, and it also stated: "We shall not be called upon to assume charge of the settlement or defense of any claims made or 'suits' brought or proceedings instituted against you, but we shall have the right and be given the opportunity to associate with you in the defense and control of any claim, 'suit' or proceedings where the claim or 'suit' involves or appears reasonably likely to involve us, in which event, we and you will cooperate in all things in the defense of such claim, 'suit' or proceeding." Finally, the Continental policy contained a nonvoluntary payment clause.

---

[3] The settling insurers cite *Northern Ins. Co. of New York v. Allied Mut. Ins.* (9th Cir. 1992) 955 F.2d 1353 in their reply brief for the proposition that the nonvoluntary payment provision does not apply between insurers. *Northern* held that the trial court erred when it refused to permit an insurer to pursue equitable contribution from a coinsurer for pre-tender defense costs. Even though the *Northern* court permitted the equitable contribution claim to proceed, it cited the same equitable considerations noted in *Unigard* and recognized that they "may weigh against reimbursement." (*Northern, supra,* 955 F.2d at p. 1361.) Insofar as the settling insurers suggest that *Northern* compels a different analysis than *Unigard,* we disagree. The two cases are consistent in their recognition of equitable principles.

[4] Continental contends that the Continental policy excludes coverage for trademark infringement. In their reply, the settling insurers refute that contention. The field of entertainment endorsement in the Continental policy states that the policy "does not apply to 'personal injury' arising out of 'the business of the insured in the field of entertainment.' " As defined, personal injury means unauthorized use of titles, formats, ideas, characters, plots or other program material and "[i]nfringement of copyright or common law property rights in literary or musical materials, plagiarism, unfair competition or privacy." The business of the insured means the "ownership, operations, maintenance or use of merchandising programs, advertising or publicity material characters or ideas whether or not on premises of the insured or in possession of the insured at the time of the alleged offense." Because these arguments were not briefed or raised at the trial level, and due to the ambiguity of the endorsement, we are in no position to interpret its meaning on appeal.

██ Notice provisions in occurrence policies are designed to help the insurer investigate, settle and defend third party claims. (*Unigard, supra,* 79 Cal.App.4th at p. 975.) "If an insured breaches a notice provision, resulting in substantial prejudice to the defense, the insurer is relieved of liability." (*Ibid.*) Similarly, a cooperation clause permits the insurer to handle claims. For example, an insurer might be " 'precluded from advancing any defenses' " absent assistance from the insured. (*Id.* at pp. 975–976.) Only through a cooperation clause can an insurer secure all the information material to its rights and obligations. (*Id.* at p. 976.) "Where an insured violates a cooperation clause, the insurer's performance is excused if its ability to provide a defense has been substantially prejudiced. [Citations.]" (*Ibid.*) In contrast to the rules above, an insurer need not show prejudice to enforce a nonvoluntary payment clause. (*Id.* at p. 977.) " ' "[T]he existence or absence of prejudice to [the insurer] is simply irrelevant to [its] duty to indemnify costs incurred *before* notice. The policy plainly provides that notice is a *condition precedent* to the insured's right to be indemnified; a fortiori the right to be indemnified cannot relate back to payments made or obligations incurred before notice. . . . The prejudice requirement . . . applies only to the insurer's attempt to assert lack of notice as a *policy defense* against payment even of losses and costs incurred *after* belated notice." ' [Citation.]" (*Ibid.*)

Now that we have explicated the particulars of the Continental policy, we must examine the nature of the settling insurers' claim against Continental and the relationship between Disney and Continental as defined by the salient features of the Continental policy. (*Unigard, supra,* 79 Cal.App.4th at pp. 977–978.) Disney had no right to seek indemnity because it breached the notice provision and the nonvoluntary payment provision. "[A]lthough the [Continental] policy language may not be controlling" in deciding whether the settling insurers' claim has merit, "it is certainly relevant." (*Id.* at p. 978.) "After all, we are supposed to consider the particulars of the policy in deciding whether equitable contribution is appropriate. [Citations.]" (*Ibid.*) An indemnity obligation should not be imposed on an insurer in contravention of its policy language unless there is a compelling equitable reason. (*Ibid.*)

██ Consistent with *Unigard,* we hold that the settling insurers cannot recover from Continental because they did not notify Continental of its potential liability for contribution prior to Disney's settlement. (*Unigard, supra,* 79 Cal.App.4th at pp. 981–982.) Imposing contribution on Continental would saddle it with "a significant financial burden even though it did not enjoy any of the concomitant benefits" (*id.* at p. 979), such as cooperation and participation in the defense. The settling insurers "decided to investigate and settle [the Goto.com case] without [Continental's] involvement. Having done so, [the settling insurers] should not be permitted to drag [Continental] into the picture after the fact." (*Ibid.*)

The settling insurers observe that the insurer in *Unigard* actively controlled the defense and settlement of the two actions for which it was denied contribution. Here, in contrast, the settling insurers did not control Disney's defense or settlement of the Goto.com action. Next, the settling insurers posit that Continental suffered no prejudice through lack of participation in the defense and settlement because it had no right to control the defense to the exclusion of Disney. Based on these points, the settling insurers advance a series of arguments.

Because Disney controlled its own defense, and because the settling insurers did not pay any sums until after Continental received notice of the settlement, the settling insurers argue that it would be unreasonable for us to hold that they cannot obtain contribution unless they notified Continental of its potential liability. This reasoning is not persuasive. Tacitly, the settling insurers suggest that they stand in the same position as Continental. But their position was significantly different—they had notice. Consequently, nothing prohibited the settling insurers from protecting their rights. Also, they could have asked Disney to identify all its insurers so that the settling insurers could contact potential coinsurers.[5]

The settling insurers contend that "Disney's failure to pursue all possible insurance coverage as requested placed [American] and Lexington in a precarious position, and Disney's refusal to keep [American] and Lexington apprised of the settlement negotiations prevented [American] and Lexington from exercising any influence over the settlement." Despite Disney's lack of cooperation, the settling insurers paid Disney's claim. Reading between the lines, the settling insurers seem to suggest that because they did not enforce their association, cooperation and no voluntary payment clauses, and because they made what was in essence a gratuitous payment of benefits, Continental should not be allowed to enforce any of its policy provisions. But the logic of this position does not flow. Continental was in a helpless position. The settling insurers, on the other hand, could have insisted on their rights. Having sat upon their rights to the detriment of Continental, the settling insurers cannot now call upon equity to lessen their burden.

---

[5] In their opening brief, the settling insurers state: "Lexington requested that Disney provide information as to other carriers and both [American] and Lexington requested that other carriers be notified, but Disney failed to do so." Instead of citing us to supporting evidence, the settling insurers cited us to their statement of additional material facts in the opposition separate statement they filed with respect to Continental's motion for summary judgment. Because we were not cited to evidence, we cannot accept the settling insurers' statement regarding their request for information as true. Moreover, a " 'reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment.' " (*Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1050 [213 Cal.Rptr. 69].)

Next, the settling insurers point out that Continental had no right to control Disney's defense, only a right to associate counsel. According to the settling insurers, the right to associate counsel was only theoretical because Continental never associated counsel in any case against Disney. They also contend that nothing would have changed had Continental received notice of the Goto.com action prior to the settlement and exercised its right to associate counsel. The problem with these arguments is that they are based on the faulty presumption that prejudice to Continental is relevant to our consideration. It is not. (*Unigard, supra,* 79 Cal.App.4th at p. 977.) Because notice is a condition precedent to indemnity, prejudice is irrelevant. Moreover, the nonvoluntary payment provision was designed to protect Continental against coverage by fait accompli. (*Id.* at p. 981.)

It is true that the insurer in *Unigard* had the right to control or shared control of the insured's defense and Continental had no such right. But through the consent provision in the Continental policy, Continental had control over any settlement that obligated it to pay money. Moreover, it is speculative for the settling insurers, or us, to opine what influence Continental would have had on the Goto.com action had it been notified of its potential liability for contribution.

(4)   The policy of applying *Unigard* to this case.

The settling insurers warn us that applying *Unigard* to this case will transform it into a general rule governing every equitable action between insurers. In their view, it would be bad public policy to require an insurer to give notice to coinsurers in order to preserve equitable contribution rights because the insurer will be forced to pursue its own interests while it is trying to handle a claim.

At the outset, the settling insurers must be disabused of the notion that *Unigard*, or this opinion, establishes a general rule. Equity is flexible, and the factors considered in *Unigard* must be considered on a case-by-case basis. To the settling insurers' attack on the wisdom of applying *Unigard* as we have, we respond as follows: Insurers on the risk with notice of a claim are in a position to protect their rights, whereas insurers on the risk without notice have no opportunity to protect their rights. Absent compelling equitable considerations to the contrary,[6] it is unfair and inequitable to saddle insurers on the risk with contribution sans notice of potential liability for contribution. The settling insurers suggest that the task of identifying coinsurers will distract the insurer's attention, possibly its main attention, away from

---

[6] For example, a court could consider whether an insurer on the risk was actively at fault for not receiving notice.

claims handling. We do not share this fear. We have every confidence that insurers will be able to handle the matter effectively in the ordinary course of business.

**2. *Infoseek had knowledge of circumstances prior to February 12, 1999, that could lead to a claim against the Gulf policy, so Gulf did not have a duty to defend or indemnify.***

The Gulf policy excludes coverage for a third party claim during the policy period arising out of a known prepolicy period circumstance that could have been reasonably expected to lead to the claim. The settling insurers aver that there was a possibility that on February 12, 1999, Infoseek did not possess knowledge of a prior wrongful act that could reasonably be expected to lead to a claim. In any event, the settling insurers contend that Infoseek was entitled to a defense with respect to wrongful acts that occurred during the policy period. Thus, they contend that there were triable issues that demanded denial of summary judgment.

This contention lacks merit.

**a. The Gulf policy.**

The Gulf policy was a specialty errors and omissions liability policy, and the specified policy period was from February 12, 1999, to January 5, 2000. It applied to claims first made during the policy period pertaining to wrongful acts during the policy period and certain wrongful acts prior to the policy period. A claim based on a prior wrongful act was covered, but only if the prior wrongful act was committed between March 10, 1997, and February 12, 1999, and if the insured was unaware of "a circumstance that could reasonably be expected to lead to a" claim and there was no other collectible insurance. Wrongful acts included a "negligent act, error or omission."

The Gulf policy provided that wrongful acts that "take place between [March 10, 1997] and the end of the Policy Period of the last policy We issue to You" and "are related by common facts, circumstances, transactions, events and/or decisions will be created under this policy as one Wrongful Act."

**b. The law.**

The duty to defend arises when an insured tenders the defense of a potentially covered third party claim. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose*); *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].) "The determination whether the insurer

owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. [Citation.]" (*Montrose*, at p. 295; see *Horace Mann Ins. Co.*, at p. 1081 [quoting *Montrose*].) Once an insurer considers the facts from all available sources and determines that the third party claim is not potentially covered, it can refuse to provide a defense. However, the insurer does so at its own risk. (*Dillon v. Hartford Acc. & Indem. Co.* (1974) 38 Cal.App.3d 335, 339 [113 Cal.Rptr. 396].) If the insurer "later develops liability, or potential liability existed under the policy, the [insurer] will be held accountable to its insured, or to one who obtained judgment against its insured in the action it refused to defend. [Citation.]" (*State Farm Mut. Auto. Ins. Co. v. Flynt* (1971) 17 Cal.App.3d 538, 548 [95 Cal.Rptr. 296].) For example, if an insured is sued by a third party, the insurer refuses to defend, and the third party obtains a judgment, three things could happen. The insurer is free from liability if there was no potential for coverage and no actual coverage. If there was potential coverage and actual coverage, the insurer can be sued for the cost of the defense and must indemnify the insured for the judgment. Finally, if there was a potential for coverage but, in the end, there was no actual coverage, the insured is entitled to recover the cost of the defense but must bear the judgment. (*Ibid.*; see also *Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1788 [23 Cal.Rptr.2d 73].)

■ Typically, if a duty to defend exists, then it ends when the third party action is over. But the duty to defend "may be extinguished earlier, if it is shown that no claim can in fact be covered. [Citation.] If it is so extinguished, however, it is extinguished only prospectively and not retroactively: before, the insurer had a duty to defend; after, it does not have a duty to defend further. [Citations.]" (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 46 [65 Cal.Rptr.2d 366, 939 P.2d 766].) In order to extinguish the duty to defend earlier than the end of the third party action, the insurer must "produce in court *undisputed* extrinsic evidence which *conclusively* establishes that there is no potential for coverage." (*Haskel, Inc. v. Superior Court* (1995) 33 Cal.App.4th 963, 977 [39 Cal.Rptr.2d 520].) "Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor. [Citations.]" (*Montrose, supra*, 6 Cal.4th at pp. 299–300.)

**c. The duty to defend (prior wrongful acts).**

(1)  Information available to Gulf at the time of tender and after.

Infoseek tendered its claim on March 4, 1999, and provided Gulf with a copy of the Goto.com complaint. The Goto.com complaint alleged that

"Infoseek, through a partnership with [Disney], started a 'beta' Internet service" that used the infringing mark. It went on to allege that "[o]n December 22, 1998, prior to the formal launch of [the partnership's] service under the [infringing mark], [Goto.com] demanded that use of the [infringing mark] cease. During the period through February 16, 1999, the parties engaged in negotiations for a business resolution to the dispute. These discussions were not successful."

Sayers did not think the claim was covered due to the cease-and-desist demand in December 1998, but she wanted more information. On June 15, 1999, Ludwig sent her a facsimile admitting that Disney informed Infoseek of the Goto.com matter on January 19, 1999. By October 1999, Sayers had not received any additional information, and she wrote to Ludwig that "[i]f we have not heard from you by October 25, 1999, we will assume you and the insured have determined not to pursue coverage for this claim and we will close our file." Ludwig told Sayers to contact Infoseek's general counsel or retained counsel, but she thought it would be useless.

### (2)   Gulf did not have a duty to defend Infoseek.

In pursuit of a reversal, the settling insurers argue: (1) Gulf knew of no facts at the time of the tender establishing that Infoseek knew Goto.com's demands against Disney could reasonably be expected to lead to a lawsuit against Infoseek. (2) Gulf has not produced undisputed evidence of Infoseek's knowledge. (3) At a minimum, a possibility existed that prior to February 12, 1999, Infoseek was not aware of a circumstance that could lead to a claim. (4) Goto.com's allegation that it sent a cease-and-desist letter on December 22, 1998, regarding the infringing mark, and its allegation that the parties engaged in negotiations to resolve the dispute, did not prove that the Goto.com action fell outside the Gulf policy. (5) The evidence showed that Goto.com's cease-and-desist demand was made on Disney, not Infoseek. Therefore, Gulf had no information that a written claim was made to Infoseek, or was reasonably expected by Infoseek, prior to February 12, 1999. (6) The trial court ignored evidence that Bochner, an Infoseek representative, testified that when he learned of Goto.com's demand, he felt that it simply amounted to posturing in an effort to secure a business deal between Disney and Infoseek. He did not believe that Goto.com would file a lawsuit on the claim. (7) The trial court went too far in interpreting the allegations of the complaint, speculating far beyond what is permissible. The trial court erroneously assumed that the cease-and-desist letter was addressed to Infoseek. Also, the trial court improperly concluded that negotiating a business solution would be an alternative to a lawsuit. This ignored the possibility that up until February 16, 1999, Infoseek may have reasonably believed that the negotiations would result in some resolution, or at least a stalemate, and that the

dispute would not become a lawsuit. (8) Nothing in Ludwig's June 15, 1999, letter to Sayers established what Infoseek knew as of January 19, 1999, and nothing in it gave Gulf a right to refuse to provide a defense. (9) Ludwig's June 15, 1999, letter confirms that Gulf had a duty to defend because it informed Gulf that Disney received the cease-and-desist letter, not Infoseek.

We draw different conclusions from the evidence.

On March 4, 1999, at the time of tender, all Gulf had was a copy of the Goto.com complaint. On its face, the Goto.com complaint demonstrated that there was no coverage. The allegation that Infoseek, through the partnership, started an Internet service that used the infringing mark, and that on December 22, 1998, Goto.com demanded that the infringing use cease, showed that Infoseek knew of circumstances that could reasonably lead to a claim prior to February 12, 1999. This showing was bolstered by the allegation that the parties engaged in negotiations for a business solution to the dispute through February 16, 1999. Logically, this means that the parties negotiated from December 22, 1998, to February 16, 1999.

■ Anytime there is a possible trademark infringement, and the ensuing dispute involves corporations that stand to generate substantial revenues based in part on the use of the competing trademarks to promote their business, that dispute can reasonably be expected to lead to a lawsuit. That is not to say that the dispute will lead to a lawsuit, only that it might lead to a lawsuit. We reach this conclusion through an objective analysis. Our cue for employing an objective analysis is the use of the word "reasonably" in the Gulf policy. Black's Law Dictionary defines the word reasonable as follows: "Fair, proper, or moderate under the circumstances . . . [¶] . . . [¶] . . . having the faculty of reason . . . ." (Black's Law Dict. (8th ed. 2004) p. 1293.) In case law, the word reasonable has been tethered to an objective rather than a subjective analysis; e.g., reasonable or probable cause in a malicious prosecution action is "defined under an objective standard as " 'whether any reasonable attorney would have thought the claim tenable." ' [Citations.]" (*Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 857 [80 Cal.Rptr.2d 803, 968 P.2d 514].) The plain language of the Gulf policy requires an objective rather than a subjective analysis.

Tacitly, the settling insurers urge us to interpret the phrase "could reasonably be expected to lead to a [c]laim" under the Gulf policy to mean that an insured does not have disqualifying knowledge unless it subjectively believes it is going to be sued. Hence, they ask us to consider Bochner's subjective beliefs about what Goto.com planned to do vis-à-vis the dispute. However,

the Gulf policy is not reasonably susceptible to an interpretation that coverage is dependent upon Infoseek's subjective beliefs about whether it was going to be sued by Goto.com.

All the foregoing aside, our job is not done. We still have to examine the relevance of Sayers's investigation. " 'Inadequate allegations of a third party's complaint are not determinative of an insurer's obligation to defend if the insurer learns from the insured or other sources facts which give rise to the potential of liability under its policy.' [Citations.]" (*Downey Savings & Loan Assn. v. Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1088 [234 Cal.Rptr. 835].)

The information acquired by Gulf after March 4, 1999, did not materially change the facts that it knew. Importantly, Ludwig, and therefore Infoseek, did not deny having knowledge of the Goto.com dispute over the infringing mark prior to February 12, 1999. When Sayers pressed Ludwig for more information, he did not provide it. Instead, he simply told her to contact Infoseek's general counsel or its retained lawyers. Sayers decided there was no need to investigate further.

Though Sayers was not aware of the facts regarding the negotiations between Goto.com, Disney and Infoseek, those facts bear out the correctness of her decision. The early February 1999 e-mails between the parties, the discussion document, and the draft tolling agreement signed by Infoseek demonstrate that the allegations in the Goto.com complaint were true, i.e., the parties tried to negotiate a business solution to their dispute between December 22, 1998, and the date the Goto.com action was filed on February 18, 1999. Moreover, the evidence suggests that Infoseek was aware of the possibility of litigation and therefore knew of circumstances that could lead to a claim against the Gulf policy. An invoice to Disney from the law firm of Finnegan, Henderson, Farabow, Garrett & Dunner displays the following entries. For February 1, 1999: "Telephone call from M. Stark regarding status of preparations in relation to [Goto.com] claims; follow-up telephone call to Infoseek to arrange additional telephone calls." For February 9, 1999: "Confer with client regarding status of settlement discussions; continue to prepare client declarations in support of potential opposition to temporary restraining order or preliminary injunction motion."

### d.   The duty to defend (wrongful acts during the policy period).

In part, the trial court ruled that "[the settling insurers] [assert] that the complaint itself constituted a claim within the policy period which in and of itself . . . supports coverage, and therefore Gulf had an immediate duty to defend, and consequently a duty to participate in settlement. The [trial court]

finds that while the complaint may be a claim within the policy period . . . , the infringement of the [mark] was one 'wrongful act' as defined under [the Gulf policy], as the acts are 'related by common facts, circumstances, transactions, events and/or decisions.' That one wrongful act occurred before inception of the policy."

Incorrectly, the settling insurers aver that the trial court erred.

They argue that the Gulf policy "did not specifically limit its coverage for acts during the policy period due to pre-policy inception knowledge of a circumstance that could reasonably be expected to lead to a claim, and thus Gulf was obligated to defend Infoseek for the 'Claim' presented during the policy period consisting of the *Goto.com* action." According to the settling insurers, the definition of wrongful act, which appears in the wrongful act definition change endorsement, "contains no language suggesting that it somehow limits coverage for allegations of continuous wrongs alleged to have commenced prior to the policy period." They urge that the definition "only resolves the question of whether such acts will be treated as one 'Wrongful Act' for purposes of the policy's limits, without addressing *when* the one 'Wrongful Act' is deemed to have happened."

We reject any notion that the Gulf policy did not specifically proscribe coverage for wrongful acts during the policy period insofar as they were related to prior wrongful acts that Infoseek knew about. A known prior wrongful act (i.e., a claimed negligent act, error or omission) constitutes a circumstance that can reasonably be expected to lead to a claim against Infoseek. If a prior wrongful act and wrongful acts during the policy period are related by common facts, circumstances, transactions, events or decisions, then they are treated as one wrongful act under the Gulf policy. Logically, that wrongful act is treated as happening at the start of the chain of events. This means that there is no coverage for the related wrongful acts during the policy period because they are subsumed within the one prior wrongful act.

Contrary to the settling insurers' position, the definition of wrongful act is not limited to how a related group of acts will be treated for purposes of policy limits. The wrongful act definition change endorsement applies to part 6.L. of the Gulf policy. Part 6 of the Gulf policy sets forth definitions for the entire policy, not just parts of the policy. In other words, the definitions apply globally.

### e. The duty to indemnify.

In their reply brief, the settling insurers contend that Gulf had a duty to indemnify Infoseek. This contention is belied by the evidence. Even if Gulf had a duty to defend (it did not), it had no duty to indemnify. The negotiations that Disney, Infoseek and Goto.com had in order to achieve a business solution to their dispute over the infringing mark demonstrate that Infoseek possessed disqualifying knowledge prior to February 12, 1999. Our conclusion is bolstered by the signature of an Infoseek principal on the February 10, 1999, draft tolling agreement.

### 3. Because the Admiral policy is excess to the Gulf policy and follows form, Admiral cannot be held liable.

The Admiral policy, which was excess to the Gulf policy, followed form to the Gulf policy but disclaimed any duty to defend. As is relevant, the trial court ruled: "The Admiral policy is excess to the Gulf policy and follows form. For the same reasons given for granting the motion on behalf of Gulf, the motion on behalf of Admiral is granted." Still, the settling insurers argue that the Admiral policy was triggered by the Goto.com complaint. Having failed to prevail as to Gulf, the settling insurers cannot prevail as to Admiral.

The purpose of the Admiral policy was to insure Infoseek for any excess losses. It provided, inter alia, that the Admiral policy "shall follow that of the primary insurance except" that nothing in the policy obligated Admiral "to assume charge of the settlement or defense or any claim or suit brought or proceeding instituted against the Insured, but [Admiral] shall have the right and be given the opportunity to associate with the Insured in the defense or control of any claim, suit or proceeding which appears reasonably likely to involve [Admiral]."

Because Infoseek had knowledge of the Goto.com dispute prior to February 12, 1999, coverage was precluded under the Gulf policy, as discussed in part 2, *ante*. Therefore, the Admiral policy was not triggered.

All other issues raised by the parties are moot.

## DISPOSITION

The judgment is affirmed. Continental, Gulf and Admiral shall recover their costs on appeal.

Boren, P. J., and Doi Todd, J., concurred.